J-S20038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ROBERT L. BURGESS | : | |
| | : | |
| Appellant | : | No. 1375 WDA 2021 |

Appeal from the PCRA Order Entered October 26, 2021
In the Court of Common Pleas of Beaver County
Criminal Division at No(s):  CP-04-CR-0002178-2012

BEFORE:  NICHOLS, J., MURRAY, J., and KING, J.

MEMORANDUM BY KING, J.:                **FILED: NOVEMBER 09, 2022**

Appellant, Robert L. Burgess, appeals *pro se* from the order entered in the Beaver County Court of Common Pleas, which dismissed his first petition filed under the Post Conviction Relief Act ("PCRA").[1]  We affirm.

The PCRA court opinion accurately set forth the facts and procedural history of this case.  (**See** PCRA Court Opinion, filed 10/26/21, at 1-10). Therefore, we will only briefly summarize the facts and procedural history most relevant to this appeal.  Appellant and his co-defendant, Devon Shealey, became involved with Demetria Harper through a mutual acquaintance, Margarette Moore.  Ms. Moore testified that Appellant and Mr. Shealey made a plan with Ms. Harper whereby Appellant would give Ms. Harper money to

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

buy marijuana from El Paso, Texas at a cheap rate and mail the drugs to Appellant's residence in Pittsburgh. Pursuant to their plan, on June 25, 2008, Appellant, Ms. Harper, Ms. Moore and another individual named Sean Kenney met at the Pittsburgh International Airport. Appellant and Mr. Kenney walked towards the ATM machine and withdrew money to give to Ms. Harper, and she boarded the plane for El Paso. On June 27, 2008, Ms. Harper told Ms. Moore that El Paso police confiscated the marijuana that she purchased. Appellant did not believe that Ms. Harper was telling the truth. On June 30, 2008, Ms. Moore saw a box being delivered to Ms. Harper's residence and relayed this information to Appellant.

Ms. Harper's daughter testified that later that same evening she and her sister went to their parents' bedroom to retrieve a ball and encountered a tall, skinny man wearing all black with a mask covering his face. The man ordered the girls to go inside their parents' closet at gunpoint. Another shorter man with a mask covering his face was also present. The girls heard the men arguing with their parents regarding a box. The men took Ms. Harper, and her husband, Richard Harper, to the basement. The tall man returned and ordered the girls to the basement where they saw their parents lying on the floor with their hands and feet tied up. The men directed the girls into a furnace room, from where they heard two gunshots.

Appellant's cousin, Tyrone Beasley, testified that on the evening that the Harpers were murdered, Appellant asked Mr. Beasley to switch cell phones

- 2 -

with him, stating that someone had stolen money from him. On July 2, 2008, Mr. Beasley learned about the double homicide on the news. When he asked Appellant whether he had anything to do with murders, Appellant nodded his head in the affirmative and admitted to participating in the shootings. Isaiah Paillett testified that he and Appellant were incarcerated on the same cell block in 2010 and became acquainted. Mr. Paillett testified that Appellant admitted to murdering the Harpers with Mr. Shealey and provided specific details about the homicide.

On October 28, 2014, a jury convicted Appellant of two counts of first degree murder, burglary, kidnapping, unlawful restraint and various firearms and drug charges. Appellant filed a timely post-sentence motion, claiming, among other things, that the evidence was insufficient to establish that Appellant was the person who committed the crimes of which he was convicted. The trial court denied the post-sentence motion on March 31, 2015. Appellant's counsel did not choose to pursue the insufficiency claim on appeal but proceeded on other grounds. This Court affirmed the judgment of sentence on August 30, 2016, and our Supreme Court denied the petition for allowance of appeal on February 28, 2017. *See Commonwealth v. Burgess*, 156 A.3d 353 (Pa.Super. 2016) (unpublished memorandum), *appeal denied*, 641 Pa. 246, 167 A.3d 699 (2017).

On September 8, 2017, Appellant timely filed a *pro se* PCRA petition. The PCRA court appointed counsel, who filed a no-merit letter and petition to

withdraw. On January 9, 2019, the PCRA court granted counsel's petition to withdraw and issued notice of its intent to dismiss the petition without a hearing per Pa.R.Crim.P. 907. In response, Appellant filed a *pro se* amended PCRA petition on July 24, 2019. and obtained new counsel who filed an amended PCRA petition on May 3, 2021. The court held a PCRA hearing on August 5, 2021 and August 6, 2021, and denied PCRA relief on October 26, 2021. Appellant filed a timely notice of appeal on November 15, 2021. On December 3, 2021, the PCRA court ordered Appellant to file a concise statement pursuant to Pa.R.A.P. 1925(b), and Appellant complied on December 9, 2021. On December 20, 2021, Appellant filed a motion to proceed *pro se* on appeal, which the PCRA court granted following a hearing pursuant to **Commonwealth v. Grazier**, 552 Pa. 9, 713 A.2d 81 (1998).

Appellant raises the following issues for our review:

> Did trial and appellate counsel provide ineffective assistance when they failed to raise [that] the prosecutor did not establish sufficient facts to prove Appellant was the actual person who committed the crimes charged beyond a reasonable doubt on direct appeal?

> Did trial and appellate counsel provide ineffective assistance when they failed to call a material witness who would have testified that he assisted the Commonwealth's jailhouse [informant] in obtaining material facts from Appellant's cell during his absence in order to provide false testimony so he could avoid a fifteen year to life sentence in federal court?

(Appellant's Brief at 3).

In his issues combined, Appellant contends that appellate counsel provided ineffective assistance by failing to pursue a challenge to the

- 4 -

sufficiency of the evidence on appeal. Appellant asserts that the Commonwealth presented two equally and mutually inconsistent inferences about who committed the crimes and failed to prove beyond a reasonable doubt that Appellant, and not Mr. Kenney, committed the murders. Appellant argues that Ms. Moore described Mr. Kenney as tall and dark skinned which is the same description given by Ms. Harper's daughter of the masked assailant. Appellant insists that Mr. Kenney was present at various stages in the drug deal and the evidence demonstrates that it was just as likely that Mr. Kenney committed the murders as it was that Appellant committed them. Appellant contends there was no reasonable basis for counsel's failure to pursue this meritorious claim on appeal and the advancement of such a claim would have resulted in a new trial.

Further, Appellant asserts that trial counsel provided ineffective assistance by failing to call a material witness, Lamon Street, who would have provided key testimony to discredit Mr. Paillett's testimony against Appellant. Appellant posits that Mr. Street would have testified that Mr. Paillett planned to search Mr. Shealey's cell for documents to learn details about the Harper murders to falsely testify against Mr. Shealey and Appellant in the hopes of getting a lighter sentence for himself. Appellant asserts that Mr. Street testified as such during Mr. Shealey's trial and would have been willing to do so for Appellant as well. Appellant claims Mr. Paillett's testimony was instrumental in establishing that Appellant committed the murders and there

was no reasonable basis for counsel's failure to call a witness that would have demonstrated that Mr. Paillett's testimony was false. Appellant concludes that trial and appellate counsel were ineffective for failing to call Mr. Street as a witness at trial and failing to pursue a challenge to the sufficiency of the evidence on appeal, and he is entitled to a new trial. We disagree.

"Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error." *Commonwealth v. Beatty*, 207 A.3d 957, 960-61 (Pa.Super. 2019), *appeal denied*, 655 Pa. 428, 218 A.3d 850 (2019). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth v. Boyd*, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). "[W]e review the court's legal conclusions *de novo*." *Commonwealth v. Prater*, 256 A.3d 1274, 1282 (Pa.Super. 2021), *appeal denied*, __ Pa. __, 268 A3.d 386 (2021).

"Counsel is presumed to have rendered effective assistance." *Commonwealth v. Hopkins*, 231 A.3d 855, 871 (Pa.Super. 2020), *appeal denied*, ___ Pa. ___, 242 A.3d 908 (2020).

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no

reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

*Commonwealth v. Sandusky*, 203 A.3d 1033, 1043 (Pa.Super. 2019), *appeal denied*, 654 Pa. 568, 216 A.3d 1029 (2019) (internal citations and quotation marks omitted).  The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail.  *Commonwealth v. Chmiel*, 612 Pa. 333, 30 A.3d 1111 (2011).

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit[.]"  *Commonwealth v. Smith*, 167 A.3d 782, 788 (Pa.Super. 2017), *appeal denied*, 645 Pa. 175, 179 A.3d 6 (2018) (quoting *Commonwealth v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994)).  "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim."  *Commonwealth v. Poplawski*, 852 A.2d 323, 327 (Pa.Super. 2004).

"Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests."  *Commonwealth v. Kelley*, 136 A.3d 1007, 1012 (Pa.Super. 2016) (quoting *Pierce, supra* at 524, 645 A.2d at 194-95).

> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success.  Counsel's decisions will be

considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

*Commonwealth v. King*, 259 A.3d 511, 520 (Pa.Super. 2021) (quoting *Sandusky, supra* at 1043-44).

Claims involving appellate counsel ineffectiveness, moreover, involve concerns unique to appellate practice. Arguably meritorious claims may be omitted in favor of pursuing claims which, in the exercise of appellate counsel's objectively reasonable professional judgment, offer a greater prospect of securing relief. Appellate counsel ... need not and should not raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal. This process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.

*Commonwealth v. Lambert*, 568 Pa. 346, 366, 797 A.2d 232, 244 (2001) (internal quotation marks and citations omitted).

"To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." *Commonwealth v. Spotz*, 624 Pa. 4, 33-34, 84 A.3d 294, 312 (2014) (internal citations and quotation marks omitted). "[A] criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Hopkins, supra* at 876 (quoting *Commonwealth v. Chambers*, 570 Pa. 3,

22, 807 A.2d 872, 883 (2002)).

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements … by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Commonwealth v. Sneed*, 616 Pa. 1, 22–23, 45 A.3d 1096, 1108–09 (2012) (internal citations omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable John P. Dohanich, we conclude Appellant's issues merit no relief. In its opinion, the PCRA court comprehensively discusses and properly disposes of the issues presented. (*See* PCRA Court Opinion at 11-20; 29-35)

Specifically, the court found that a challenge to the sufficiency of the evidence would have had no arguable merit because the Commonwealth presented evidence that Appellant was involved in a drug deal with Ms. Harper, Appellant believed Ms. Harper cheated him out of money, and Appellant confessed to the murder to his cousin, Mr. Beasley, and Mr. Paillett. Further, the court determined that appellate counsel credibly testified that he did not pursue the insufficiency claim on appeal because he eliminated it as a weaker argument and chose to pursue claims that were more likely to succeed. *See Lambert, supra*. Regarding trial counsel's failure to call Mr. Street as a

witness, the court found that trial counsel credibly testified that he visited Mr. Street to gauge his willingness to testify but Mr. Street indicated that he would not be cooperative because he did not want to come to Beaver County Jail for this purpose while his own trial was pending in Allegheny County. Therefore, the court found that trial counsel had a reasonable basis for failing to call Mr. Street as a witness given that counsel was unsure what Mr. Street would say due to his unwillingness to testify. Accordingly, the court determined that Appellant could not succeed on either of his ineffective assistance of counsel claims. *See Sandusky, supra*. The record supports the PCRA court's rationale. *See Beatty, supra*; *Boyd, supra*. Accordingly, we affirm the order denying PCRA relief on the basis of the PCRA court's opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/09/2022

- 10 -

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : NO. CP-04-CR-2178-2012
:
V. :
:
ROBERT L. BURGESS, :
:
DEFENDANT :

**TESLA, J.**                                                 **JANUARY 10, 2021**

# ORDER

In 2014, the Honorable Judge John Dohanich served as trial judge in the above-captioned case. On August 5 and 6, 2021, Judge Dohanich held a hearing on Defendant's amended petition for post-conviction relief. On October 26, 2021, Judge Dohanich issued a memorandum opinion addressing Defendant's amended petition for post-conviction collateral relief.

On November 15, 2021, Defendant filed a notice of appeal to the Superior Court. Defendant filed a *pro se* Pa.R.A.P. 1925(b) statement on December 9, 2021.

Judge Dohanich resigned his commission as Senior Judge effective December 31, 2021. His thorough and diligent work ethic will be missed by the Bench of Beaver County.

**AND NOW**, this 10th day of January, 2022, after review of the thorough and comprehensive opinion of October 26, 2021 issued by Judge Dohanich it is hereby **ORDERED** that:

1. The opinion of October 26, 2021 issued by Judge Dohanich shall serve as the Pa.R.A.P. 1925(a) opinion in this case. The Court has attached a copy of the October 26, 2021 opinion to this order.

2. The Beaver County Clerk of Courts is directed to transmit this order and the record of these proceedings to the Superior Court of Pennsylvania.

3. The Court Reporter is directed to transmit the transcript of the August 5 and 6, 2021 PCRA Hearing to the Defendant.

BY THE COURT:

_____
KIM TESLA
JUDGE

| Addressee | Start Time | Time | Prints | Result | Note |
|---|---|---|---|---|---|
| DIST ATTY | 01-10 10:05 | 00:00:28 | 002/002 | OK | |

Note    TMR:Timer TX, POL:Polling, ORG:Original Size Setting, FME:Frame Erase TX,
DPG:Page separation TX, MIX:Mixed Original TX, CALL:Manual TX, CSRC:CSRC,
FWD:Forward, PC:PC-FAX, BND:Double-Sided Binding Direction, SP:Special Original,
FCODE:F-Code, RTX:Re-TX, RLY:Relay, MBX:Confidential, BUL:Bulletin, SIP:SIP Fax,
IPADR:IP Address Fax, I-FAX:Internet Fax

Result    OK: Communication OK, S-OK: Stop Communication, PW-OFF: Power Switch OFF,
TEL: RX from TEL, NG: Other Error, Cont: Continue, No Ans: No Answer,
Refuse: Receipt Refused, Busy: Busy, M-Full:Memory Full, LOVR:Receiving length Over,
POVR:Receiving page Over, FIL:File Error, DC:Decode Error, MDN:MDN Response Error,
DSN:DSN Response Error, PRINT:Compulsory Memory Document Print,
DEL:Compulsory Memory Document Delete, SEND:Compulsory Memory Document Send.

---

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : NO. CP-04-CR-2178-2012

                       V. :

ROBERT L. BURGESS, :

          DEFENDANT :

TESLA, J.                                                    JANUARY 10, 2021

# ORDER

In 2014, the Honorable Judge John Dohanich served as trial judge in the above-captioned case. On August 5 and 6, 2021, Judge Dohanich held a hearing on Defendant's amended petition for post-conviction relief. On October 26, 2021, Judge Dohanich issued a memorandum opinion addressing Defendant's amended petition for post-conviction collateral relief.

On November 15, 2021, Defendant filed a notice of appeal to the Superior Court. Defendant filed a *pro se* Pa.R.A.P. 1925(b) statement on December 9, 2021.

Judge Dohanich resigned his commission as Senior Judge effective December 31, 2021. His thorough and diligent work ethic will be missed by the Bench of Beaver County.

**AND NOW**, this 10th day of January, 2022, after review of the thorough and comprehensive opinion of October 26, 2021 issued by Judge Dohanich it is hereby **ORDERED** that:

1. The opinion of October 26, 2021 issued by Judge Dohanich shall serve as the Pa.R.A.P. 1925(a) opinion in this case. The Court has attached a copy of the October 26, 2021 opinion to this order.

# IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

      v.

ROBERT L. BURGESS

:
:
:
:
:
:
:

No. 2178 of 2012

## MEMORANDUM OPINION

DOHANICH, S.J.                                                    October 26, 2021

Presently before the Court is the amended, counseled petition of Robert L. Burgess (Burgess), filed on May 3, 2021, pursuant to the Post-Conviction Relief Act (PCRA), 42 Pa. C.S. Sections 9541-9546, in which he alleges as the sole basis the ineffective assistance of trial and appellate counsel consisting of failure to: (1) argue on appeal the insufficiency of the evidence; (2) raise the issue of the verdicts being against the weight of the evidence on post-trial motion and appeal; (3) reassert on appeal the motion for a mistrial; and (4) call two witnesses at trial.

Burgess was convicted by a jury on October 28, 2014, of two counts of first-degree murder, burglary, criminal trespass, four counts of kidnapping, four counts of false imprisonment, four counts of unlawful restraint, carrying a firearm without a license, two counts of simple assault, two counts of recklessly endangering another

person, possession with intent to deliver marijuana, conspiracy to commit possession with intent to deliver marijuana and simple possession of marijuana. The jury acquitted the petitioner of conspiracy to commit first degree murder, two counts of robbery and conspiracy to commit robbery. Upon the petitioner's waiver of jury trial and request for a bench trial on the charge of person not to possess a firearm to be heard simultaneously with the jury trial on the above charges, the court convicted the petitioner of said firearms offense. The Commonwealth, prior to trial, without objection and with leave of court, withdrew eight counts of robbery. At the time of arraignment, the Commonwealth filed its notice of intention to seek the death penalty citing six separate aggravating factors in the event of convictions of first-degree murder. Following the death penalty phase, the jury was unable to reach a verdict as to the penalty.

The instant case is the companion case to Commonwealth v. Devon O. Shealey (Shealey) at No. 2177 of 2012. Upon severance of the cases at the request of both Burgess and Shealey, in a separate trial Shealey was convicted by a jury of the identical charges, except that the jury found Shealey guilty of two counts of second-degree murder. On appeal, the Superior Court affirmed the judgment of sentences of Shealey at No. 186 WDA 2015. The Supreme Court denied Shealey's petition for allowance of appeal at No. 245 WAL 2016. This court's denial of

2

Shealey's subsequent PCRA petition was affirmed by the Superior Court at No. 125 WDA 2020.

The charges against Burgess resulted from the invasion of the home and shooting deaths of Richard Harper (Richard) and his wife, Demetria Harper (Demetria), in the presence of their two minor daughters, Laniya, age 10, and Iyana, age 8, committed by Burgess and co-defendant, Shealey, in the late evening hours of June 30, 2008, in the Harper residence located at 809 Second Avenue, Beaver Falls, Beaver County, Pennsylvania.

On November 25, 2014, the court sentenced Burgess to two consecutive terms of life imprisonment on the first-degree murder convictions, followed by consecutive sentences on two counts of kidnapping relating to the children of not less than ten years nor more than twenty years; person not to possess a firearm of not less than five years nor more than ten years; and, possession with intent to deliver marijuana of not less than two years nor more than four years, for aggregate consecutive sentences of not less than 37 years nor more than 74 years. Sentences on the remaining charges were ordered to run concurrent or merged with corresponding offenses.

The facts of the case were previously summarized in this Court's Opinion of June 23, 2015, as follows:

3

In the spring of 2008, Demetria and Margarette (Nay Nay) Moore (Moore) became acquainted through the activities of their respective children as residents in the same Second Avenue, Beaver Falls neighborhood, and over time, became close friends. The Harper family had relocated to Beaver Falls from El Paso, Texas. Moore had been familiar with the defendant, Burgess, since attending high school; lost touch with him through the years; and resumed their relationship in 2007. Burgess lived on Letsche Street in the North Side section of Pittsburgh. Moore introduced Demetria to Burgess when Demetria transported Moore to the Burgess residence in early June, 2008. On at least two additional occasions, Demetria drove Moore to the Burgess home within a week or two of the first visit, during which the co-defendant, Shealey, was also present. Demetria was introduced to Shealey, also known as "D", through Burgess, who was also known as "Raw". At one of the meetings, Demetria advised Burgess and Shealey that she could obtain marijuana for an attractive price in El Paso, which prompted discussions among Demetria, Burgess, Shealey and Moore, and led to a plan by which Burgess and Shealey would front funds to Demetria for her to travel to El Paso, obtain marijuana, and mail it to an address provided by Burgess. To assure Demetria's participation in the plan, a copy of Demetria's identification card, which included her address, was made by Burgess on a copier at his residence. On June 25, 2008, Moore drove Demetria to the Burgess residence where Demetria purchased a round-trip airline ticket online utilizing the computer of Burgess by which Demetria would travel from Pittsburgh to El Paso and return to Pittsburgh. Moore then transported Demetria to her home in Beaver Falls where she packed a suitcase and was taken by Moore to the Pittsburgh International Airport. Upon arriving at the airport, Demetria and Moore met Burgess and another unidentified individual. Burgess provided Demetria with $1,500.00 in funds to purchase marijuana in Texas. Demetria departed thereafter and arrived in El Paso later that day. After several days of negotiations, Demetria, by way of arrangements made through LaDon Williams (Williams), a friend of Demetria in El Paso, she purchased four pounds of marijuana for $800.00. The marijuana had an odor of gasoline, and Demetria and Williams attempted to remove the odor by way of a process of boiling vegetables in a pot while holding the marijuana above the steam that was generated. While in Texas from June 25, 2008, through June 29,

4

2008, Demetria remained in constant contact with Moore, who was in the presence of and staying at the residence of Burgess. Shealey was also present at the Burgess home during this time. Moore, at the direction and insistence of Burgess, sent numerous text messages to Demetria inquiring as to the progress of her efforts to obtain the marijuana. After acquiring the marijuana, Demetria falsely forwarded a text message to Moore that Demetria had been stopped by the police at a checkpoint, had been arrested and the marijuana confiscated, when in fact, she had the marijuana mailed to her home in Beaver Falls. According to Moore, Burgess doubted Demetria's truthfulness. Prior to Demetria returning to Pittsburgh, Burgess and Shealey drove to Baltimore, Maryland to visit Burgess' girlfriend, Antoinette Smothers (Smothers). Demetria returned home from Texas on June 29, 2008. Upon observing a package being delivered to the Harper residence on June 30, 2008, Moore telephoned Burgess while he was in Baltimore to report the delivery. Immediately thereafter, Burgess and Shealey departed Baltimore and returned to Pittsburgh in the early evening hours. Later that same night, Burgess and Shealey traveled to Beaver Falls, entered the Harper home wearing masks completely covering their faces, gloves and dark clothing, and confronted Demetria and Richard at gun point in their second floor bedroom while the two children were present demanding the return of the money previously provided and/or the marijuana. Demetria advised that the marijuana was in a box in the bedroom to which Burgess replied that they had no interest in the box. Demetria and Richard were taken to the basement at gunpoint and hog-tied by the hands and feet from behind with an electrical cord from a vacuum sweeper. The children were then escorted from the second floor bedroom to the basement and placed in a furnace room a short distance away from their parents, whom they observed bound and face down on the basement floor. Shortly thereafter, Shealey shot Richard in the head and Burgess shot Demetria in the head. The children heard the two shots from their location in the furnace room and also their father groaning from his wound. Burgess and Shealey retrieved the box containing the marijuana and departed, returning to Pittsburgh. The children remained in the furnace room the entire night until approximately 11:00 a.m. on July 1, 2008, when their aunt, Joanne Vaughn (Vaughn), the sister of Richard, arrived at the house after spotting Richard's vehicle outside the residence at a time

5

when he should have been at work. Richard and Demetria were deceased when discovered by Vaughn who called police. Within days of the killings, Cheryl Chambers (Chambers) and her daughter, Rachel Harden (Harden), a girlfriend of Shealey and mother of his child, observed Shealey in the possession of marijuana with an odor of gasoline attempting to remove the moisture and gasoline odor of the marijuana using a hairdryer.

Tyrone Beasley, Jr., who is the first cousin of Burgess, testified on behalf of the Commonwealth indicating that he and Burgess were very close having known each other their entire lives; were residents of the same neighborhood; and saw each other on a daily basis during 2008. Burgess had provided a cellular telephone, for which he was the subscriber, to Beasley for his use. Burgess informed Beasley that he would be traveling to Baltimore to visit a female acquaintance at the end of June, 2008. Upon the defendant's return from Baltimore on June 30, 2008, he directed Beasley to exchange the cellular telephone that Beasley was using for the cellular telephone Burgess possessed, and instructed Beasley not to answer any calls he received on Burgess' cellular telephone unless he could identify the caller. When Beasley inquired as to the reason for swapping telephones, Burgess replied that "somebody got out on him on some money." In the early morning hours of July 1, 2008, Beasley and his wife, Dara, had an argument, and Beasley went to the home of Burgess to spend the night. Later that morning, Beasley inquired of Burgess as to whether he wanted to walk their dogs, and Burgess replied that "something just went down", and he was required to obtain his vehicle in Beaver Falls. Beasley was employed at Community College of Allegheny County in the housekeeping department and worked the 11:00 P.M. through 7:30 A.M. shift, Tuesday through Saturday. While at work from 11:00 P.M., Tuesday, July 1, 2008, through 7:30 A.M., Wednesday, July 2, 2008, he learned of the double homicide in Beaver Falls while watching the news on television. After completing his shift, Beasley met Burgess, informed him of the news item, and inquired of Burgess whether Burgess obtaining his automobile in Beaver Falls had anything to do with the double homicide. Burgess put his head down to his chest and nodded in the affirmative. Burgess advised Beasley that a person had "got out on him over money and he had to get his". Burgess provided

6

additional details of arriving at the Harper residence and admitted to participating in the shootings.

Testimony was elicited by the Commonwealth from Cheryl Chambers and her daughter, Rachel Harden, that in the summer of 2008 they had met Burgess through the co-defendant, Shealey, who fathered a child with Rachel Harden. Shealey was a daily visitor to the Harden residence along with Burgess. Chambers testified that she knew that Burgess had a girlfriend in Baltimore and had gone to visit her with Shealey at the end of June, 2008. In November, 2008, as a result of reviewing various telephone records, Detective Sergeant Michael Kryder of the Beaver Falls Police Department called Harden's cellular telephone number which was subscribed to Chambers. Upon learning that Harden was a minor, Detective Sergeant Kryder requested that she have Chambers return his call. Upon contacting the Beaver Falls police, Chambers was advised that they wanted to speak with Harden and Chambers, and a meeting was scheduled for the Eat N' Park Restaurant in Bellevue, Allegheny County. Immediately after scheduling the meeting, Chambers contacted Burgess who met Chambers and Harden at their residence. Burgess informed them that he knew that the subject of the police inquiry was regarding a bad drug deal and instructed them to inform police that the reason that his telephone number appeared on their telephone records was because he was dating Chambers' older daughter, Rochelle. Burgess also informed them that he would have someone observing the meeting, and that if they did not follow his instructions that there would be consequences. Chambers and Harden met with Detective Kryder and Detective Timmie Patrick of the Beaver County District Attorney's Office Detective Bureau at the Eat N' Park as scheduled and were shown two photographs, one of which was of Burgess who they both identified. When Chambers inquired regarding the subject of the investigation, she was informed that a double homicide had occurred in Beaver Falls. At the conclusion of the meeting, Chambers and Harden departed, and on the way home, telephoned Burgess who met them at their residence. Chambers informed Burgess that the police were investigating the double homicide in Beaver Falls and not a bad drug deal. During this period of time, the co-defendant, Shealey, was being held in the Allegheny County Jail on an unrelated homicide charge. Burgess expressed concern regarding Shealey "running his mouth" and directed

7

Harden to inquire of Shealey as to whether the Beaver Falls police had contacted him. Chambers and Harden also indicated that Shealey had access to the cellular telephone in the possession of Harden. The telephone records disclosed contact between Demetria and Harden's telephone number. Both Chambers and Harden denied that they had ever been in contact with Demetria. Burgess also advised Chambers and Harden that he had an alibi for his whereabouts at the time of the double homicides. Harden further indicated that Burgess was overly concerned with the Beaver County situation.

Isaiah Paillett provided testimony on behalf of the Commonwealth that he had known the defendant since 1993 as friends from the North Side of Pittsburgh. He was aware that Burgess and Shealey knew each other, since he had introduced them during the summer of 2007. As a result of being indicted by the Federal authorities, Paillett, Shealey and Burgess were incarcerated in 2010 at the Northeastern Ohio Correctional Facility on the same cell block with free access to one another from April 28, 2010 through May 12, 2010, at which time Burgess provided specific details of his participation together with Shealey in committing the murders of the Harpers. Burgess confirmed that Shealey shot Richard and that he shot Demetria.

Trial Court Opinion (TCO), 6/23/15, at 6-14.

This court denied the post-trial motion of Burgess on April 27, 2015. On appeal, the Superior Court, in its Non-Precedential Decision of August 30, 2016, affirmed the judgment of sentence at No. 700 WDA 2015. The Supreme Court denied Burgess' petition for allowance of appeal on February 28, 2017 at No. 367 WAL 2016.

Burgess's initial, timely, pro-se PCRA petition was filed on September 8, 2017, asserting 21 instances of ineffective assistance of counsel and two allegations of Commonwealth misconduct. On September 15, 2017, the court appointed Steven

8

Valsamidis, Esquire as PCRA counsel for Burgess. A supplemental, pro-se PCRA petition was filed by Burgess on December 4, 2017 alleging two additional claims of ineffective assistance of counsel and one incident of Commonwealth misconduct. After granting PCRA counsel four extensions of time, Mr. Valsamidis filed a petition to withdraw and no merit letter in which he described in detail his review of the entire record and his independent investigation leading to his conclusion that the issues raised by Burgess lacked merit, and that his search found no further claims worthy of argument. Mr. Valsamidis further filed a supplemental petition to withdraw and no merit letter on November 27, 2018 in response to notification by Burgess of a witness who he named as "Keith". Upon the court's independent evaluation of the record, Burgess was advised by the court's order of January 9, 2019 of its intention to dismiss his PCRA petition without a hearing. A rule was issued to Burgess to show cause why the petition should not be dismissed and advising him of his right to proceed pro-se or engage private counsel. After granting Burgess four extensions, he filed a pro-se amended PCRA motion on July 24, 2019 for which the court scheduled a hearing on December 6, 2019. Current PCRA counsel Erika P. Kreisman, Esquire entered her appearance on December 4, 2019 and was granted a motion to continue the hearing. Three additional requests for extension of time were subsequently granted. The hearing on Burgess' amended PCRA petition was

9

conducted on August 5 and 6, 2021, during which counsel for Burgess called as witnesses, Captain Curt Couper of the Beaver Falls Police Department, Lamon Street, and Burgess' trial and appellate co-counsel, Mitchell P. Shahen, Esquire (now Judge Shahen) and Thomas N. Farrell, Esquire.

Burgess' sole PCRA issues are based on ineffective assistance of trial and appellate counsel. The court, in **Commonwealth v. Spotz, 624 Pa. 4, 33-34, 84 A.3d 294, 311-312 (2014)**, set forth the legal framework governing such claims, as follows:

> As relevant here, a PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. Section 9543(a)(2)(ii). "Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." *Colavita*, 606 Pa. at 21, 993 A.2d at 886 (citing *Strickland, supra*). In Pennsylvania, we have refined the *Strickland* performance and prejudice test into a three-part inquiry. *See Pierce, supra.* Thus, to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result. *Commonwealth v. Ali*, 608 Pa. 71, 86, 10 A.3d 282, 291 (2010). If a petitioner fails to prove any of these prongs, his claim fails." *Commonwealth v. Simpson*, --- Pa. ---, 66 A.3d 253, 260 (2013) (citation omitted). Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. *See Ali, supra.* Where matters of strategy and tactics are concerned, "[a] finding that a chosen strategy

10

lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Colavita*, 606 Pa. at 21, 993 A.2d at 887 (quotation and quotation marks omitted). To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different" *Commonwealth v. King*, 618 Pa. 405, 57 A.3d 607, 613 (2012) (quotation, quotation marks, and citation omitted)."

'[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.' " *Ali*, 608 Pa. at 86-87, 10 A.3d at 291 (quoting *Commonwealth v. Collins*, 598 Pa. 397, 957 A.2d 237, 244 (2008) (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052)).

Utilizing the above guidance, Burgess' issues will be examined.

## SUFFICIENCY OF THE EVIDENCE

Burgess asserts that trial and appellate counsel, although raising insufficiency of the evidence in their post-trial motion, were ineffective in failing to pursue this claim on appeal. In support of this argument, Burgess sets forth two grounds: (1) that the Commonwealth presented two equally and mutually inconsistent inferences of who committed the offenses and therefore proved neither; and (2) that the testimony of three of the Commonwealth's witnesses was not credible and thus not worthy of belief.

In reviewing a claim of the insufficiency of the evidence, the court is guided by the well-established principles summarized in **Commonwealth v. Gooding, 818**

11

**A.2d 546, 549 (Pa. Super.2003)**, citing **Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa. Super.2001)**, as follows:

> The standard we apply in reviewing the insufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Burgess argues, relying on **Commonwealth v. Woong Knee New, 354 Pa. 188, 47 A.2d 450 (1946)**, and **In the Interest of J. B., 647 Pa. 339, 189 A.3d 390 (2018)**, that the Commonwealth's evidence demonstrated one scenario in which Burgess and co-defendant, Shealey, committed the murders of the Harpers, and a second version of Shealey and Sean Kenney (Kenney), often referred to as the unidentified, tall, dark skinned, black male, doing so. A review of the record reveals that Kenney's involvement during the entire period related to the events of this case to be limited to the following: (1) presence at the Burgess residence when

12

Demetria's airline ticket was purchased online using Burgess' computer; (2) presence at the airport with Burgess when funds were provided to Demetria by Burgess to purchase marijuana in El Paso, Texas on the day of Demetria's departure; (3) three telephone calls between the telephones utilized by Kenney and Demetria, the content of which is unknown, one being on June 25, 2008, the day of Demetria's departure, and two on June 26, 2008, while Demetria was in El Paso, Texas. On the other hand, the evidence presented by the Commonwealth against Burgess is extensive, including participation from the outset in all discussions with Shealey, Moore and Demetria in the plan to obtain marijuana in El Paso, Texas; use of his computer to purchase Demetria's airline ticket online; providing the funds to purchase the marijuana and directing that it be transported by FedEx to his mother's residence located directly behind Burgess' home; maintaining continuous contact with Demetria through numerous communications by way of Moore while Demetria was in Texas primarily by texting and inquiring of the status of her efforts to obtain the marijuana; upon being advised by Demetria that she had been stopped by the police while in possession of the marijuana, directing her to take a photograph of the inside of the police cruiser; shortly after receiving a call from Moore that a package had been delivered to Demetria's residence, departing from Baltimore where he and Shealey were visiting Burgess' girlfriend, Antoinette Smothers, after telling her

13

"Babe, I got to go 'cause they f'ing up my money"; upon returning from Baltimore, directing his cousin, Tyrone Beasley, Jr., to exchange the cellular phone that Beasley was using for the cellular telephone that Burgess possessed and instructing Beasley not to answer any calls he received on Burgess' cellular telephone unless he could identify the caller; upon Beasley inquiring as to the reason for swapping the telephones, informing Beasley that "somebody got out on him on some money"; after the murders, informing Beasley when asked whether he wanted to walk their dogs, that "something just went down" and he was required to obtain his vehicle in Beaver Falls; upon Beasley learning of the double homicide in Beaver Falls while watching the news and asking whether the double homicide in Beaver Falls had anything to do with his obtaining his automobile, Burgess nodding in the affirmative and advising Beasley that a person had "got out on him over money and he had to get his"; providing additional details of arriving at the Harper residence and admitting to Beasley to participating in the shootings; when informed by Cheryl Chambers that the Beaver Falls Police Department had contacted her after reviewing telephone records, receiving a telephone call from Chambers and instructing her to tell the police that his phone number appeared on her daughter's telephone records because he was dating Chambers' other older daughter and informing Chambers that he would be having someone observing the meeting, and if they did not follow his

14

instructions there would be consequences; receiving a telephone call from Chambers following the meeting with the Beaver Falls Police by which he was informed that the subject of the investigation was the double homicide in Beaver Falls; expressing concern regarding Shealey "running his mouth" and directing Chambers' daughter to inquire of Shealey as to whether the Beaver Falls Police had contacted him; admission to Isaiah Paillett while they and Shealey were incarcerated in 2010 at the Northeastern Ohio Correctional Facility on the same block with free access to one another from April 28, 2010 through May 12, 2010, and providing specific details of his participation together with Shealey in committing the murders of the Harpers in which he confirmed that Shealey shot Richard and he shot Demetria.

Although the convictions in the instant case, **New**, supra, and **In the Interest of J. B.**, supra, were all based on circumstantial evidence, the similarities end there. New was charged with the murder of the owner of a laundry with whom he had regular visits for over one year. The cornerstones to the Commonwealth's case were (1) that the defendant was with the victim at a time allegedly admitted by the defendant without any supporting information as to how the time was fixed so definitely, and doubt regarding whether he understood the questions being asked of him by the police; and (2) the time of death provided by the coroner which was within the timeframe of the defendant's admission was mere conjecture. The court

15

indicated that other circumstances only showed that the defendant may have had the opportunity to commit the murder but such opportunity was not exclusive to the defendant, and all circumstances proved by the Commonwealth were consistent with some other person committing the murder. The court ruled when two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty, and that when a party on whom rests the burden of proof in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither. The court determined that the evidence was insufficient to sustain New's conviction.

**In the Interest of J. B.**, supra, a juvenile was charged with the murder of his step-mother and her unborn child. The primary factor relied upon by the juvenile court to adjudicate J. B. as delinquent was his finding that the .20 gauge shotgun recovered from J. B.'s room was established to be the murder weapon, however, the court noted that the evidence of record which the Commonwealth presented on this issue, even when accepted as true, did not make this the only reasonable inference which could be drawn therefrom. The court described the two possible scenarios as follows:

16

In sum, then, all of the Commonwealth's forensic and eyewitness testimony, and all reasonable inferences derived therefrom, viewed in a light most favorable to it, was, at best, in equipoise, as it was equally consistent with two possibilities: first, that a person or persons unknown entered the house in which J.B.'s stepmother was sleeping and shot her to death after J.B. and his sister had left for school on the morning of February 20, 2009; second, the Commonwealth's theory that, after J.B.'s father left for work, J.B., in full view of J.H., walked upstairs and retrieved a .20 gauge shotgun from his bedroom, walked back downstairs, retrieved a shotgun shell from a box of shells located in an armoire in the victim's bedroom on which the television set she was watching was located, shot the victim in the back of the head as she lay on the bed facing that television, took the shotgun back upstairs and returned it to its former position ---- after wiping it clean of any physical evidence caused by the shooting ---- then caught the school bus with J.H., and went to school as if it were any other normal morning.

The court concluded, citing to **New**, that the testimony presented by the Commonwealth to establish appellant's guilt was at least equally consistent with the juvenile's innocence and therefore insufficient to sustain his conviction.

In neither the **New** nor **In the Interest of J. B.** cases was there an admission by the defendant/juvenile to the crime, which clearly distinguishes those cases from the present case, in which the defendant made admissions to two individuals, one of whom was his close cousin. The principles annunciated in **New** and **In the Interest of J. B.** are therefore inapplicable to the facts in the instant case.

Both Mr. (now Judge) Shahen in his testimony at the PCRA hearing, and Mr. Farrell, in his affidavit attached to Burgess' Addendum to Amended Petition

17

Pursuant to the Post Conviction Relief Act, opined that the sufficiency of the evidence argument had no merit based upon the standard of review by the Superior Court, which was that in viewing the evidence in the light most favorable to the Commonwealth, the evidence supported the conviction. Therefore, although the insufficiency of the evidence claim was included in a post trial motion, both counsel agreed that it would not be successful on appeal. The issue of appellate counsel ineffectiveness was addressed in **Commonwealth v. Lambert, 568 Pa. 346, 366-367, 797 A.2d 232, 244, (2001)**, as follows:

> To the extent that appellant assails prior counsel for his failure to raise claims on appeal, as opposed to his failure to raise them at trial, that is a stage of the proceeding that is also subject to the settled *Strickland* test for counsel ineffectiveness. *Smith v. Robbins,* 528 U.S. 259, 285-89, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (petitioner "must satisfy both prongs of the *Strickland* test in order to prevail on his claim of ineffective assistance of appellate counsel"). Claims involving appellate counsel ineffectiveness, moreover, involve concerns unique to appellate practice. Arguably meritorious claims may be omitted in favor of pursuing claims which, in the exercise of appellate counsel's objectively reasonable professional judgment, offer a greater prospect of securing relief. *Jones v. Barnes,* 463 U.S. 745, 750-54, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) "[A]ppellate counsel...need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Robbins,* 528 U.S. at 288, 120 S.Ct. 746 (characterizing *Barnes*). "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), quoting *Barnes,* 463 U.S. at 751-52, 103 S.Ct. 3308. See also *Buehl v. Vaughn,* 166 F.3d 163, 174 (3d Cir.1999) ("One element of effective

18

appellate strategy is the exercise of reasonable selectivity in deciding which arguments to raise.").

In his testimony at the PCRA hearing, Mr. Farrell, in response to the court's questioning, confirmed that the post trial motion contained nine issues, while on appeal only three issues were argued. Mr. Farrell further indicated that when taking an appeal, he utilizes a process by which a determination is made as to which issues are more likely to succeed and those that should be eliminated as weaker arguments, and he performed that analysis in the present case in choosing the arguments to present to the Superior Court, consistent with **Lambert's** direction.

Burgess has thus failed to satisfy any of the three prongs of the *Strickland/Pierce* test, in that, he has not shown that the claim for insufficiency of the evidence has arguable merit, that counsel had no reasonable basis for not including said claim on appeal, and that there was a reasonable probability that the result would have been different had the issue been raised on appeal. Trial and appellate counsel were therefore not ineffective in not pursuing this issue on appeal.

The second basis of Burgess' insufficiency of evidence claim relates to the testimony of three of the Commonwealth witnesses, Margaret Moore (Moore), Tyrone Beasley, Jr. (Beasley), and Isaiah Paillett (Paillett), which he contends is not credible and not worthy of belief. As directed entirely to the credibility of these three Commonwealth witnesses, Burgess' claim challenges the weight, not the

19

sufficiency of the evidence, **Commonwealth v. Palo, 24 A.3d 1050, 1055, (Pa. Super. 2011)**, and therefore, this issue is addressed in the following section discussing the weight of the evidence.

## VERDICTS AGAINST THE WEIGHT OF THE EVIDENCE

Burgess argues that trial and appellate counsel's failure to raise the issue of the verdicts being against the weight of the evidence constitutes ineffective assistance of counsel, because each of the witnesses testimony is unreliable. In the case of Margaret Moore she was an uncharged accomplice and allegedly provided inconsistent and false statements. As to Tyrone Beasley, who was a close cousin of Burgess, he allegedly gave inconsistent statements and was allegedly pressured to testify for the Commonwealth, an allegation that was rejected by both this court and the Superior Court on appeal and thus previously litigated. In the case of Isaiah Paillett, he had an extensive criminal record, is alleged to have given inconsistent statements and was facing pending Federal charges in which he had entered a guilty plea and was awaiting sentencing pending his cooperation in this case.

Initially, the court notes that a true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed. **Commonwealth v. Lewis, 911 A.2d 588, 566 (Pa. Super. 2006)**, citing **Commonwealth v. Hunzer, 868 A.2d 498, 506-507 (Pa. Super. 2005)**. The

20

credibility of witnesses and the weight of evidence are determinations that lie solely with the trier of fact, who is free to believe all, part or none of the evidence. **Lewis at 566,** citing **Commonwealth v. Williams, 854 A.2d 440, 445 (Pa. 2004).** A new trial should be awarded only when the verdict is so contrary to the evidence as to shock one's sense of justice, and the award of a new trial is imperative so that right may be given another opportunity to prevail. **Commonwealth v. Causey, 833 A.2d 165, 173-174 (Pa. Super. 2003).** Questions concerning improper motive go to the credibility of the witnesses, **Palo, supra, at A.3d 1055,** citing to **Commonwealth v. Boxley, 575 Pa. 611, 838 A.2d 608, 612 (2003).**

The record discloses that Mr. Shahen extensively questioned Moore and Beasley on cross-examination regarding their inconsistent statements and possible motives for testifying. Despite attacking Moore's credibility, Burgess urges that her testimony regarding his skin tone and not actually being able to observe the exchange of the money at the airport be accepted as truthful. Beasley and Burgess were so close that Burgess participated as a member of Beasley's wedding party. Mr. Farrell, likewise, vigorously cross-examined Paillett as to his criminal history, pending Federal charges and inconsistent statements. In his closing argument, Mr. Farrell reviewed the testimony of all three witnesses and strongly questioned their credibility. Furthermore, in its charge, the court instructed the jury generally on

21

judging the credibility of the witnesses, and specifically, to receive with caution the testimony of Paillett as having an interest in testifying favorably for the Commonwealth due to pending Federal charges, and to view the testimony of Moore as an accomplice with disfavor because it comes from a corrupt and polluted source. In his affidavit attached to Burgess' Addendum to Amended Petition pursuant to the Post Conviction Relief Act, Mr. Farrell outlined his reasons for choosing not to raise the issue of the verdicts being against the weight of the evidence, because the claim was unlikely to succeed. In recalling this court's statements regarding the evidence at the time of sentencing, Mr. Farrell opined that the trial court would not grant a new trial based on the weight of the evidence, and that the Superior Court rarely accepts an argument on the weight of the evidence.

The jury in this case heard the testimony of Moore, Beasley and Paillett, including the cross-examination by defense counsel regarding their motives and inconsistencies with prior statements. The court provided the jury with guidance on the factors by which to judge credibility, both generally and specifically with respect to Moore and Paillett. As noted above, the jury, as the sole trier of the facts, was free to believe all, part or none of their testimony in determining the weight to be given to such evidence. The court concludes that the jury's verdicts were not so contrary to the evidence so as to shock one's sense of justice. Burgess' weight of

22

the evidence argument therefore is without merit. Trial and appellate counsel had a reasonable basis for not pursuing the claim on post trial motion or on appeal, and Burgess suffered no prejudice resulting from counsel's action. Burgess has thus failed to demonstrate that trial and appellate counsel were ineffective in not arguing the weight of the evidence claim either on post trial motion or on appeal.

## FAILURE TO PURSUE DENIAL OF MOTION FOR MISTRIAL ON APPEAL AND FAILURE TO REQUEST CAUTIONARY INSTRUCTION

Next Burgess faults trial and appellate counsel for failure to (1) pursue denial of the motion for mistrial on appeal, and (2) request a cautionary instruction, both in connection with testimony of Agent Maurice Ferentino referencing a portion of Burgess' computer log-in as being related to gang members. This issue of the denial of the motion for mistrial was raised by defense counsel in their post trial motion and previously addressed in this court's Memorandum of Opinion of 6/23/15, 29-34, which is incorporated herein and adopted in its entirety, as follows:

> The defendant next alleges that the court abused its discretion in refusing to grant a mistrial on the basis that Agent Maurice Ferentino testified the defendant was a gang member or associated with a gang, and that such testimony violated Rule 404(b) of the Pennsylvania Rules of Evidence, 42 Pa. C.S., prohibiting evidence of a crime, wrong or other acts and requiring notice from the Commonwealth of its intended use of such evidence.
>
> In response to the assistant district attorney's inquiry regarding the significance of the user name of "raw 1728" on the defendant's computer from which the airline ticket was purchased for Demetria to

23

travel to El Paso, Texas to obtain marijuana, the following direct testimony and cross-examination of Agent Ferentino reveals evidence contrary to the defendant's allegations:

**BY MS. POPOVICH:**

Q.   Now, you were also present for the testimony involving the purchasing of the plane ticket; is that correct?

A.   The plane ticket?

Q.   To Texas.

A.   Oh, yes.

Q.   And the use of the computer that we have as Commonwealth's Exhibit No. 74?

A.   Yes.

Q.   And you heard that the user account was "raw1728"?

A.   Yes.

Q.   Does that have any significance to you?

A.   Yes.

Q.   Okay. First of all, the "raw" part?

A.   The "raw" being Mr. Burgess.

Q.   Okay. What does 1728 mean to you?

A.   1728 is, I know I just spoke to the jury regarding the gang members that we, as ATF, indicted in 2010. 1728 or 28 was popular among the gang members. They would wear tattoos that said 1728 or 28.

24

I know this from both the gang members that were indicted and cooperating informants in that investigation that 1728 referred to an abandoned house on Brighton Place, a street in the North Side of Pittsburgh where gang members would congregate, fight dogs, stash drugs, and weapons.

MR. SHAHEN: Objection, Your Honor. May we approach side bar?

(WHEREUPON, the following proceedings were had at side bar:)

MR. SHAHEN: Your Honor, I, at this point my objection is based upon the answers given by the agent whereas a reference to gangs and gang related symbols. I don't know, first off, based upon the fact that that, that he is now associating Mr. Burgess with a gang under the circumstances where I was never given a definition of Rule 7 what 1728 is.

I don't, even if I was, Your Honor, by asking that question and taking that information and putting it before the jury I think we have created a situation now of the jury knowing or believing or being told that my client is a member of a gang warrants a mistrial, and for that reason, Your Honor, I would ask for a mistrial.

MS. POPOVICH: Your Honor, I am not illiciting the testimony to say he was part of a gang. My next question was going to be we are not here saying he was part of a gang. However, there was testimony, and this was all brought out through cross-examination of Margarette Moore, that the other individuals that he associates with, Devon Shealey, the tall dark individual, that they were gang members. They are serious. They are gang members. That all came out through Margarette Moore's testimony. This is just showing knowledge of Shealey, and it goes with his knowledge of Devon Shealey.

MR. FARRELL: So Shealey is part of RICO?

25

THE COURT: What are you intending to do next?

MS. POPOVICH: Actually my next question is we are not here saying that Robert Burgess is a member of the gang.

MR. QUINN: It may even lead into, because Shealey was a part of RICO that this affiliates him with the RICO, this 1728.

MR. SHAHEN: Your Honor, my fellow wasn't even charged.

MR. QUINN: I didn't mean affiliated. Burgess, it shows him that he's aware of the gang members. As she said Shealey is a part of RICO, being a part of the gang member, and –

THE COURT: Well, whether Shealey is a part of gang members or not I don't think is relevant, so I don't know that I'm going to let you get into that. The question you indicated you are going to ask I will permit.

MS. POPOVICH: Um-hum.

THE COURT: Your motion for mistrial is denied.

(WHEREUPON, the side bar proceedings were concluded, and thereafter the following proceedings were had in open Court:)

THE COURT: Miss Popovich.

## BY MS. POPOVICH:

Q. And, Agent Ferentino, just to clarify we are not here testifying today that Mr. Burgess was part of a gang?

A. No. You asked me if the number 1728 had any significance to me, and I answered your question.

Q. Okay.

26

## CROSS-EXAMINATION BY MR. SHAHEN:

Q.    Good morning, Agent Ferentino.

A.    Good morning.

Q.    I want to make it clear for everybody that you're speaking to in this courtroom that when you mentioned 1728 and what it stands for, you in no way and in no manner intended to tell this jury that Mr. Burgess was a member of any gang, is that true?

A.    Miss Popovich asked the question if 1728 had any significance to me, and I answered the question.

(T.T. Volume XII, Pages 109-114)

Rule 605 of the Pennsylvania Rules of Criminal Procedure, 42 Pa. C.S., sets forth the requirements for a mistrial, as follows:
(B) When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial judge may declare a mistrial only for reasons of manifest necessity.

A mistrial is an extreme remedy and is required only when the incident is of such nature that the unavoidable effect is to deprive the defendant of a fair trial. *Commonwealth v. Montalvo, 434 Pa. Super. 14, 38, 641 A.2d 1176, 1188 (1994)* (Citations omitted). "Prejudicial", in the context of a motion for mistrial, denotes an event which may reasonably be said to have deprived the defendant of a fair and impartial trial. *Id.*, citing *Commonwealth v. Larkin, 340 Pa. Super. 56, 63, 489 A.2d 837, 840-841 (1985)*. The specific test to be applied upon a motion for mistrial is whether improper evidence was admitted at trial, such as would so compromise the fact-finder that it would be unable to remain impartial, thereby prejudicing the defendant beyond a reasonable doubt. *Id.*, citing *Commonwealth v. Dean, 300 Pa. Super. 86, 91, 445 A.2d 1311, 1313 (1982)*. A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury

27

from weighing and rendering a true verdict. *Commonwealth v. Rega, 593 Pa. 659, 692, 933 A.2d 997, 1016 (2007), Commonwealth v. Simpson, 562 Pa. 255, 754 A.2d 1264, 1272 (2000).*

In the present case, Agent Ferentino clearly testified on both direct and cross-examination that he was not indicating that Burgess was a gang member. The defendant has therefore failed to demonstrate the prejudice required to deprive him of a fair and impartial trial to warrant the extreme remedy of a mistrial.

Although Mr. Farrell indicated that he could not recall the reason for not including the denial of the motion for a mistrial on appeal, as previously noted in the section on the insufficiency of the evidence, he utilized a process to determine the strongest issues to argue on appeal and did so in this case reducing the nine issues in the posttrial motion to three issues on appeal to the Superior Court, in accordance with **Commonwealth v. Lambert, supra**.

As to the issue of not asking for a cautionary instruction, Mr. Shahen testified at the PCRA hearing that this was addressed in another way through his cross-examination of Agent Ferentino as well as the direct testimony in which Agent Ferentino indicated that he was not suggesting that Burgess was a part of a gang.

Mr. Shahen further noted that the log-in was related to Burgess' computer. Mr. Farrell further testified that he was unsure if a cautionary instruction would be helpful and has in the past made strategic decisions not to ask for a cautionary instruction so as not to re-emphasize an unpleasant point to the jury. In

28

**Commonwealth v. Bracey, 831 A.2d 678 (Pa. Super. 2003)**, the Superior Court

approved the analysis of the trial judge regarding the prosecutor's reference to the

defendant's silence, which is equally applicable in the instant case, as follows:

> Immediately after referencing his silence, the Assistant District Attorney stated that it was the defendant's right not to say anything. When the motion for a mistrial was made, I decided that the comment that the defendant had a right to remain silent adequately corrected the reference to his silence and that a cautionary instruction would have called unnecessary attention to the reference. Furthermore, there was testimony that the defendant gave varying statements to the police in both the truck and the police station. Therefore, the degree of prejudice caused by reference to the silence was lessened by the fact that the jury heard testimony that he gave statements to the police. *Commonwealth v. Ghur,* 327 Pa.Super. 18, 25, 474 A.2d 1151, 1154 (1984). I concluded that the Commonwealth's remark was de minimis and that a curative instruction was not necessary.

In light of Agent Ferentino both on direct and cross-examination testifying that he

was not indicating that Burgess was a member of a gang, any degree of prejudice by

reference to a gang was lessened and a curative instruction would only have

accentuated the reference to a gang. This claim is thus without merit and appellate

counsel was not ineffective in not raising it on appeal.

## FAILURE TO CALL WITNESSES

In his final claim, Burgess argues that trial counsel erred in not calling Captain

Curt Couper of the Beaver Falls Police Department and Lamon Street.

29

In **Commonwealth v. Sneed, 616 Pa. 1, 23, 45 A.3d 1096, 1108-1109 (2012)**, the court summarized the guidelines for failure to call a witness, as follows:

> When raising a claim of ineffectiveness for failure to call a witness, a petitioner satisfies the performance and prejudice requirements of the *Strickland* test by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d523, 536 (2009); *Commonwealth v. Clark*, 599 Pa.204, 961 A.2d 80, 90 (2008). To demonstrate *Strickland* prejudice, a petitioner "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1134 (2008). Thus, counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been helpful to the defense. *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1319 (1996). "A failure to call a witness is not per se ineffective assistance of counsel for such decision usually involves matters of trial strategy." Id.

PCRA petitioner bears the burden to demonstrate that trial counsel had no reasonable basis for declining to call a witness. **Commonwealth v. Washington, 592 Pa. 698, 721, 927 A.2d, 586, 599 (2007)**. Trial counsel may act reasonably when counsel declines to call witnesses because a witness would not be credible. **Commonwealth v. Wallace, 555 Pa. 397, 408, 724 A.2d 916, 922 (1999)**. The court, in **Commonwealth v. Wantz, 84 A.3d 324, 332-333 (Pa. Super. 2014)**, rejected a petitioner's interpretation of *Sneed* that the burden was only to show that the missing

testimony would have been beneficial under the circumstances of the case and helpful to the defense, as follows:

> We disagree, as we do not conclude that either *Sneed* or the cases cited therein (including *Gibson* and *Auker*) establish a different legal standard for prejudice in the context of a missing witness claim (as opposed to any other ineffectiveness claim). Whether an uncalled witness's testimony would have been "beneficial" or "helpful" to the defense depends ultimately upon whether it would have created a reasonable probability of a different outcome at trial. In turn, when an uncalled witness's testimony would have created a reasonable probability of a different outcome trial, "the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. "*Sneed*, 616 Pa. at 23, 45 A.3d at 1109. In our view, the *Sneed Court's* use of the terms "beneficial" and "helpful" was intended merely to be explanatory of the application of the *Strickland* prejudice requirement in the specific context of a missing witness claim, and not intended to create a new (lesser) legal standard in the such situations.

Captain Couper was the first police officer to interview the two Harper children, Laniya, age 10, and Iyana, age 8, after their parents' bodies were found on the morning of July 1, 2008, and subsequently created a report of the preliminary interviews. In his report, Captain Couper wrote that Laniya described one intruder as being a dark-skinned black male, 6 feet in height wearing all black with a white mask and white gloves. She further stated that the second individual was a dark-skinned black male, 5'4" tall wearing all black with a black do-rag over his face and black gloves and a black hood. Iyana stated that the taller individual was a dark-skinned black male approximately 6 feet tall wearing all black with a white mask

31

and white gloves. In a video recorded on October 2, 2008, while residing with her grandparents in New Mexico, Laniya stated that the taller male wore boots with rubber tassels and had a deep voice, while the shorter individual had a regular voice.

At trial, more than six years later, Laniya testified that both men wore all black masks, gloves, shirts and jeans. She testified that she could not see their faces and could not tell the race of the individuals. She described one of the persons as tall and skinny and the other short and chubby. She also stated that the tall intruder had a gun which he put to Iyana's head telling her to shut up. On cross-examination, Mr. Shahen questioned Laniya regarding the description of the individuals that she provided to Captain Couper at the time that the events occurred. Laniya did not recall the description she provided to Captain Couper.

During direct-examination at trial, Iyana testified that one of the intruders was taller and the shorter one was bigger. During cross-examination by Mr. Farrell, Iyana testified that she did not see the faces of the individuals because they were wearing masks and black clothing.

Mr. Shahen at the PCRA Hearing testified that he approached the differences in the children's testimony through the use of cross-examination rather than the testimony of Captain Couper. In his cross-examination of Laniya, he questioned her regarding her statements to Captain Couper the morning after her parents were killed

32

and pointed out the discrepancies between what she was saying on the witness stand versus her statements to Captain Couper. Mr. Shahen made reference to Captain Couper's report and permitted Laniya to read the portions regarding her descriptions of the intruders. Since Captain Couper's report was specifically referred to while Laniya was testifying, defense counsel's decision not to call Captain Couper as a witness involved a matter of trial strategy, and thus Captain Couper's testimony would not have created a reasonable probability of a different outcome at trial. Burgess has thus failed to meet the prejudice requirement set forth in **Sneed**.

Lamon Street (Street), who is currently serving two consecutive thirty-year sentences after being convicted of a double homicide involving a pregnant woman and her unborn child, was an inmate at the Northeastern Ohio Correctional Facility (NOCF) from March, 2010 through March, 2011, being held on Racketeer Influenced and Corrupt Organizations Act (RICO) charges during the same time that Burgess, Shealey and Paillett were also inmates, all being housed on the same block with free access to one another. According to Street, he had previously known Paillett growing up on the Northside, but only became acquainted with Burgess and Shealey while at NOCF. Street and Shealey were part of the same gang on the Northside and were both convicted of Federal RICO charges as part of the same Federal indictment. In his discussions with Paillett at NOCF, Street testified that

Paillett was attempting to learn about the Beaver Falls Harper double homicide in order to use the information against Shealey as a way to help him avoid extensive jail time. Street claimed that Paillett told him that Shealey was his "get out of jail free card". Burgess and Shealey were cellmates and Paillett was trying to get them to open up to him about their cases, and that he was going to attempt to enter their cell to search for any documents to gain knowledge about their cases. Street claims of observing Paillett enter the cell of Burgess and Shealey, however, Street was not certain whether Paillett found any documents and could not state with certainty that Paillett found anything. Interestingly, the criminal complaint in this case was filed on November 15, 2012, more than one year after the four individuals were incarcerated together, and thus no filing documents would have been available. Street indicated that Paillett mentioned a newspaper article, but he never saw it. Street testified in the Shealey trial after notifying counsel for Shealey about Paillett's actions at NOCF. Street confirmed that Mr. Farrell visited him in the Allegheny County Jail and claims to have told Mr. Farrell that he was willing to testify even though he had no desire to do so and did not want to be transported to the Beaver County Jail. Street also stated that he informed Mr. Farrell that he would testify the same as he did in the Shealey case. Street testified at the PCRA hearing by a video conference from his place of confinement.

Mr. Farrell, in his testimony at the PCRA hearing which was based primarily on notes he took at the time of the interview of Street, stated that he met with Street on October 11, 2014 at the Allegheny County Jail. Mr. Farrell indicated that Street was not going to be cooperative and did not want to come to the Beaver County Jail, since he had a trial pending in Allegheny County. Mr. Farrell's recollection was that Street testified on behalf of Shealey because they were friends and did not know nor care about Burgess. Street did not want to come to Beaver County. In Mr. Farrell's opinion, if Street was forced to testify he would act like a jerk, and so he did not want to call him as a witness. Mr. Farrell admitted that his testimony would have been helpful but was unsure as to what Street would say. In weighing whether to call the witness to testify, Mr. Farrell advised that he always takes into account the willingness of a potential witness to testify and the uncooperative nature of Street was a primary factor in not calling him as a witness.

Burgess has failed to show that not calling these witnesses has arguable merit. Counsel provided reasonable bases for not calling the witnesses, and Burgess suffered no prejudice as a result.

Based on the foregoing, the following Order is entered: